MRS. MAGGIE DeJARNETT, Extrx. v. FIRST NATIONAL BANK OF MURFREESBORO.

Middle Section.   October 10, 1925.

No petition for Certiorari was filed.

1. Banks and banking. Evidence. Burden of proof rests on plaintiff to show instructions given bank.
    Plaintiff has burden of proof to show that bank was instructed to send drafts for collection only subject to protest.

2. **Banks and banking.** Banks not liable for loss of papers held for collection unless violation of instructions caused the loss,

Where the bank failed to send a draft subject to protest as instructed by plaintiff the plaintiff must show that loss could have been avoided if the bank had followed his instructions before he can recover from the bank.

3. **Banks and banking.** Papers deposited for collection not property of the bank.

Papers deposited for collection do not become property of the bank even if the depositor has been allowed to check against the deposit before the paper is collected.

4. **Banks and banking.** Paper deposited in bank for collection held conditional sale although at the time party placed paper for collection the bank gave credit therefor and permitted him to draw against the same.

Where it was the custom of the parties for the bank to take the paper and credit the depositor's account and let him draw against it but if it was later turned down the depositor took it up from the bank and gave his check therefor, held at best only a conditional sale.

5. **Banks and banking.** Evidence. Held not sufficient to show bank liable for loss.

Where the evidence showed that if drafts had been forwarded as instructed by the plaintiff still the plaintiff would not have received notice in time to avoid the loss, held the bank is not liable for loss although it had violated its instructions.

6. **Estoppel.** Parties taking up draft in usual custom held estopped to recover money on ground that it was done through mistake of fact.

Where a party took up a draft that had been turned down for payment, as was his usual custom and later endeavored to recover the money on the ground that he did not know the bank had not sent the draft for collection subject to protest, as he had directed, held the evidence was not sufficient to justify relief on the ground of mistake.

Appeal from Chancery Court, Davidson County; Hon. W. C. Cherry, Special Chancellor.

Reversed and dismissed.

A. H. Roberts and W. C. Houston, Jr., of Nashville, for appellant.

James D. Richardson and G. S. Ridley, Jr., of Murfreesboro, for appellee.

DeWITT, J.   The bill in this cause was filed on August 18, 1923, by the executrix of the will of John W. DeJarnett against the First National Bank of Murfreesboro, seeking to hold said Bank liable for the amounts of four drafts drawn by the said John W. DeJarnatt upon Kays and Childs at Granville, Illinois, for the purchase price of six carloads of hogs shipped by said DeJarnatt under the trade name of J. W. DeJarnatt and Company. These drafts with the dates on which they were drawn were as follows:

| | |
|---|---|
| November 10, 1920, | $4,028.12 |
| November 10, 1920, | 1,791.56 |
| November 12, 1920, | 1,753.80 |
| November 18, 1920, | 3,173.84 |

On said respective dates said drafts were deposited to DeJarnatt's credit in the defendant bank and they were sent forward by said bank to the Granville State Bank at Granville, Illinois. Kays and Childs had places of business in Granville and McNabb, Illinois. It is averred in the bill that the defendant First National Bank of Murfreesboro had general instructions from DeJarnatt to send all drafts deposited by him subject to protest if not paid on demand, which instructions were given prior to deposit of the aforesaid four drafts, and which instructions had not been withdrawn or countermanded; that not withstanding the said instructions, the defendant bank sent said drafts accompanied by a slip, marked "no pro," which in banking terms means, no protest in case of non-payment, and which said slip was used by the said bank in violation of its legal duty, and in violation of its instructions, and without the knowledge of the said DeJarnatt, or his agent. It is further averred that none of the said drafts were paid when presented to Kays and Childs, were not protested and were not promptly returned to the defendant bank, but were held for several days and returned to the bank on November 26, 1920, when all four were returned together; that if said drafts had been promptly presented for payment and due notice thereof given, the said DeJarnatt would either not have had shipped the second and third shipments of stock to Kays and Childs, or would have stopped them in transit before delivery; that when said drafts were returned to the bank, the bank notified DeJarnatt that they had been returned unpaid and payment was demanded of him therefor, which was made by him under a misapprehension of the facts and without knowing that the defendant bank had negligently and wrongfully attached "no pro" slips to said drafts when they were forwarded by it to the bank at Granville, Illinois; and that said DeJarnatt paid to the bank the amount of said drafts under said misapprehension. It is further averred that as a result of the alleged negligence and violation of duty and instructions on the part of said defendant bank said DeJarnatt suffered loss to the aggregate amount of said four drafts, and therefore it is liable to his personal representative and sole beneficiary under his will for said amount.

The defendant bank in its answer denied that it had general instructions to send all drafts by said J. W. DeJarnatt subject to protest if not paid on demand; that it breached no legal, or moral, or equitable duty in handling the drafts sued on in this cause. It admitted that it attached a slip marked "no protest" to the drafts when forwarded, but avers that if said DeJarnatt did not actually give instructions to forward drafts not subject to protest. he was conversant with the fact that the said drafts were so drawn, and made no objection to the same, and he also acquiesced in the

custom of his firm and defendant of drawing drafts on Kays and Childs not subject to protest, which custom was well known to said DeJarnatt; and it says that any damages sustained by the complainant was caused by the negligence of complainant's agent, the Granville State Bank, in failing to protest and return certain drafts drawn November 9, 1920 which were sent for collection subject to protest. The defendant also denied all of the material allegations of the bill. It averred that the drafts sued on in this cause were deposited to the credit of J. W. DeJarnatt & Company in defendant bank and that depositor was given credit upon his account for the full amount of each draft and allowed to use the money as if said drafts had already been paid by the payee; that the defendant bank made no charge for expenses, or interest, or for its services in collecting said drafts, either direct or indirect, and its handling of said drafts was gratutious. It is averred that these drafts were paid by J. W. DeJarnatt, or J. W. DeJarnatt and Company after Kays and Childs failed to pay the same. The cause was transferred by agreement to the chancery court, part two of Davidson county and there heard by a special chancellor, who was of the opinion that the defendant was liable for the amount of the drafts drawn November 18, 1920, with interest from December 1. 1920, and he rendered a decree for said sum, but dismissed the bill in so far as the two drafts of November 10, 1920, and the draft of November, 12, 1920, were concerned, and disallowed any recovery as to said three drafts. He divided the costs equally between the complainant and the defendant. From this decree both the complainant and the defendant have appealed to this court and assigned errors. The Special Chancellor held that the evidence was conflicting as to whether or not the bank had instructions to send drafts subject to protest previous to November 9, 1920; but that it clearly showed that from that time on the defendant was expressly directed by complainant's agents to send the drafts on Kays and Childs subject to protest, and the drafts sued on were sent in the next few days. He further held that the character of the business and the conduct of J. W. DeJarnatt leave no doubt that on receiving notice of protest he would have used every effort to have diverted the shipments and would have made no further shipments; that he could not have diverted any of the shipments represented by the first three drafts, but that he could have diverted the shipment for which the drafts of November 18, 1920, for $3,173.84 was drawn.

The hearing before the special chancellor seems to have been upon these issues and not upon the question of discharge of J. W. DeJarnatt as the drawer of these drafts by the failure of the bank of Granville, Illinois to have the same protested, due to the instruc-

tions sent by the defendant bank. The complainant assigns as error the dismissal of her bill as to the two drafts on November 10, 1920 and the draft drawn on November 12, 1920, for the following reasons:

(a) The complainant lost full amount of said drafts through the failure of the defendant to send the drafts subject to protest.

(b) The defendant's failure to carry out its instructions and failure to comply with the negotiable Instruments Law was a complete release of liability on the part of DeJarnatt for all of said drafts, whether he would have been able to protect himself or not.

(c) There is no proof in the record showing, or tending to show that DeJarnatt would not, or could not, have diverted these shipments and protected himself, of the drafts had been protested and prompt notification made to him.

(d) Under the law and the facts of this case there was no obligation on DeJarnatt to do anything toward protecting himself, for the reason that the bank had failed to carry out his instructions.

Thus it is seen that although it is not specifically contended in the original bill that the failure to protest the drafts operated as a release of the drawer under the Negotiable Instruments Law, section 3516a160, Shannon's Code, yet this insistence is made upon this appeal in addition to the insistence made as aforesaid in the court below.

The complainant also assigns as error the failure of the chancellor to hold expressly that J. W. DeJarnatt and Company had instructed defendant bank to send all drafts, including these sued on, subject to protest, and that in violation of said special instructions they were sent with no protest slips attached.

The defendant bank complains that the chancellor erred in finding that the drafts sued on in this cause were ordered forwarded subject to protest; in not finding that these drafts were forwarded for collection by defendant bank not subject to protest; in finding that complainant's testate would have made every effort to divert the shipments represented by the drafts sued upon upon receipt of notice of protest of any one of said drafts; in not finding that complainant's testator would have allowed all shipments to proceed regardless of the receipt of notice of protest of drafts for prior shipments; in finding that complainant's testator would have received notice of protest of one of the drafts of November 10, 1920, in time to stop the shipment represented by the draft of November 18, 1918, and that he could and would have stopped said shipment represented by said draft of November 18, 1920; in rendering judgment against defendant bank; and in overruling defendant's exceptions to certain questions and answers of witnesses in behalf of complainants.

Both parties assign as error the action of the chancellor in dividing the costs equally between them.

The initial issue of fact is as to the alleged violation of instructions by the defendant bank, for upon this alleged violation is predicated the liability for negligence. It is undisputed that in the spring of 1920 J. W. DeJarnatt, engaged under the trade name of J. W. DeJarnatt and Company, in the livestock business at Murfreesboro, began to ship live stock from Murfreesboro and other points in middle Tennessee to Kays and Childs at Granville and McNabb, Illinois. The custom was to ship the live stock direct to the said consignees and send that bill of lading by mail to the consignee, then to draw a draft for the amount thereof on the consignee through the defendant First National Bank of Murfreesboro. In this way a number of cars of live stock were shipped by DeJarnatt to Kays and Childs. J. W. DeJarnatt and Campany carried at all times on deposit a considerable sum of money in defendant bank. When a draft was thus drawn the amount thereof was placed to DeJarnatt's credit and he was allowed to check thereon, but he always had on deposit more than the amount of any single draft. Whenever a draft should be returned unpaid he immediately gave his check therefor and took up the draft. Whether or not the defendant bank had definite instructions, either general or specific, prior to November 9, 1920, to send all drafts of Kays and Childs subject to protest, the proof is conflicting. During these months the business of J. W. DeJarnatt and Company was handled by J. W. Donnell and his son, J. T. Donnell, and J. W. Donnell had full authority to transact said business, including the drawing of drafts. He testifies that the bank had instructions to send all drafts drawn by any member of the firm, or its employees, subject to protest, this instruction being given by him to Mr. Williams, the cashier of the bank, on several occasions. He admits that some drafts were sent through the bank and returned without protest. He says that two or three times over the telephone he demanded of Mr. Williams that he send these drafts subject to protest; that after his last conversation with Mr. Williams in regard to protesting the drafts, he knew of no other drafts, except these four sued on in this cause. His son J. T. Donnell who drew these drafts, testifies that at one time he told Mr. Bell, the assistant cashier of the bank, to let the drafts go just as they were written, subject to protest. He says that he heard his father and Mr. DeJarnatt tell the bank to let the drafts go subject to protest. Both he and his father testify that his father was made somewhat angry because the bank on some occasions did not carry out these instructions.

Mr. Williams testifies that he did not remember any instructions given from Mr. DeJarnatt to draw the drafts of the De-

Jarnatt firm subject to protest; that although he thought he had special instructions once or twice to send them subject to protest, these instructions did not apply to these drafts, and as a rule they were all sent not subject to protest, because that was the only way to collect them. He says that a sight draft having to be paid the day it is presented, is likely to reach the consignee before the stock would reach him and the draft would not be paid until the stock could be examined. He says that it was not practical to draw the drafts subject to protest; that he did not remember having any instructions regarding drafts on Kays and Childs. He says that in the last year of the DeJarnatt firm's business, it drew drafts amounting to $40,000 or $50,000 through his bank, and none of them were drawn subject to protest. He says that when these drafts here in question were returned to the bank on November 30, 1920, unpaid, he notified Mr. DeJarnatt and he took them up; that when a draft came back unpaid he would charge it to Mr. De-Jarnatt. In his cross-examination he says that when a draft came back unpaid he would send over and get a check from Mr. DeJarnatt to take up the unpaid draft, and this was always done very promptly. C. B. Bell the assistant cashier testifies that the bank never had any general instructions from Mr. DeJarnatt's firm to send drafts by that firm on Kays and Childs subject to protest, but that Mr. J. T. Donnell did on one occasion convey to him instructions from his father to send drafts on Kays and Childs different from the way they had been sending them, they having been sent not subject to protest. He says that then he did send certain drafts subject to protest. These drafts were drawn on November 9, 1920 and are not in question in this cause. The language of the questions and answers relating to this matter shows that beginning November 9, 1920, the instruction was that drafts drawn on Kays and Childs should be sent subject to protest. The drafts drawn on November 9, 1920, were paid. The returns came on November 20th. He says that it was not practical to send the drafts drawn for shipments of hogs subject to protest, because the drafts would arrive before the hogs would arrive. It is true that these drafts drawn on November 9, 1920, subject to protest were paid—but it may be that they were drawn and sent forward sometime after the shipment of the stock for which they were drawn.

We are of the opinion that the complainant has not sustained the burden of proof, that prior to November 9, 1920, the defend-ant bank was under instructions to send all drafts on Kays and Childs subject to protest, but that beginning on November 9, 1920, the bank did have instructions to send such drafts subject to pro-test. It is admitted that the four drafts sued on in this cause were

sent with instructions not to protest the same and they were not protested. It also appears that these carloads of hogs for which the drafts were drawn, were delivered to Kays and Childs and never paid for, so that the complainant's testator lost all of said hogs. Kays and Childs became bankrupt about that time and did not pay for the same.

We are of the opinion that the chancellor was not in error in holding that the complainant's testator, had the drafts drawn on November 10, and 12, 1920, been protested, would not have been able to protect himself against loss by diverting the shipments represented by said drafts or stopping them in transit. The record contains a number of delivery receipts showing the dates of delivery of these cars of hogs to Kays and Childs at McNabb, Illinois by the New York Central Railway. The complainant's witness, J. W. Donnell has exhibited a full abstract of way bills received by the New York Central Railway showing the respective dates of such delivery of these carloads of hogs. They show that the first two carloads were delivered on November 12, 1920; that the next two carloads were delivered on November 13, 1920. A draft drawn on November 10 or November 12, 1920, would have reached Granville, Illinois, two days later, and it would have been impossible for protest to be made in the lawful manner and notice to reach the drawer by mail prior to these dates of delivery of these hogs. We find further that as to the last two carloads of hogs, for which the draft of November 18, 1920, must have been drawn, reached McNabb, Illinois and were delivered to the consignee on November 13 and 15, 1920, respectively. Thus the draft of November 18, 1920, was actually drawn three days after the delivery of the last carload of hogs. We are unable to find anything in the record to contradict these facts, and therefore we must conclude that the special chancellor must not have had brought to his attention the actual dates of arrival and delivery of the last two carloads of hogs. We are therefore, of the opinion that he was in error in basing a decree for the amount of the draft of November 18, 1920, upon any theory that had that draft been sent subject to protest and been protested the drawer would have been able to avoid loss. It may be that he took the view that had the drafts of November 10th and 12th been sent subject to protest and been protested the last two cars would not have been shipped, or would have been diverted. It appears that these cars were shipped immediately after the other four cars and it would have been impossible to receive notice of protest of any of the first three drafts in time to avoid loss of the last two carloads of hogs.

We are assuming that these drafts were drawn with instructions that they should be sent subject to protest and the bank did not

protest them, and that the bank in violation of said instructions did not cause them to be protested when they were not accepted or were dishonored. Nevertheless under the insistence that the bank is liable for negligence it must appear that some injury resulted to the drawer of the bill of exchange by reason of such negligence, and under the facts aforesaid no such injury appears. Bank v. Fertilizer Company, 125 Tenn., 340.

> "A bank though negligent in the discharge of its duties as collecting agent, is not liable to its customer for the claim placed in its hands, unless it is shown that the claim was collectible by due diligence, and was lost in consequence of the bank's negligence. The burden is upon the plaintiff to show these facts." Sahlien v. Bank, 90 Tenn., 220.

It is clear that these drafts were drawn some days after the dates of the shipments for which they were drawn, because of the very fact that the railroads would not take shipments upon bills of lading attached to drafts, as the consignee would invariably insist upon inspecting the live stock before they would pay the drafts. The live stock was evidently shipped sometime before the draft was drawn, in each case, in order that the consignee might have an opportunity to inspect the stock by the time the draft should arrive.

It is insisted by the complainant that DeJarnatt took up said drafts under a mistake of fact, without knowledge that they were sent not subject to protest and were not protested; and that therefore his executrix is entitled to recover back the amount of such payment because it did not constitute a waiver of his discharge from liability by failure to protest. In view of the custom of dealing between DeJarnatt and the bank—its crediting the amounts of drafts to him when drawn and charging back the same to him, or being promptly repaid by him when returned unpaid—it would seem that only a conditional title to the draft would pass to the bank in any instance. The drawing of the draft, under the facts stated, could amount only to an agreement for a conditional sale of the paper; that is, that the proceeds should belong to the bank in case collection should be made, but in case it should not be made, then the paper should revert to the drawer. At last this would be but an indirect way of stating a collection contract when considered in connection with credit of the face of the amount of the draft and the right accorded by the bank to check on the deposit. The substance of the transaction would be a line of credit by the Bank for the face value of the paper to be paid out of the collection when made; if not made, the paper to be returned, and the indebtedness to stand in favor of the bank, to be made good otherwise by the customer. Implement Co. v. Bank, 128 Tenn., 324.

The intention of the parties must govern and it may be ascertained from their previous dealings. Under such circumstances, the paper being deposited for collection only, it does not become the property of the bank even if the depositor has been allowed to check against the deposit before the paper is collected. 5 Cyc., 498; Bank v. Loyd, 90 N. Y., 530; Brooks v. Bigelow, 142 Mass., 6; Bank v. Milliard, 10 Wall., 152; Greenwood Co. v. Snyder, 113 Va., 53. This must have been recognized by Mr. DeJarnatt when he would promptly take up the paper. There is no direct evidence that DeJarnatt did not know that these drafts were not sent subject to protest and were not protested, at the time when he paid back the amount of them to the bank. On the other hand, if they had been protested, notice would have been mailed by the notary at Granville, Illinois, to him at Murfreesboro in order to fix his liability as drawer. The drafts not being protested no such notice was mailed and it must be presumed from his failure to receive such notice that he knew that these drafts had not been protested when he took them up, consequently the failure of the bank to advise him that they had not been protested could not be viewed as having operated to his injury causing him to pay something which he would not otherwise have paid. It is true that money paid under a mistake of law, or fact may be recovered where it would be unconscionable for the party who obtains the advantage in such transaction to retain it. Leach v. Cowan, 125 Tenn., 182; Bigelow v. Madison, 103 Tenn., 359. The ground of relief against a mistake of fact is not the mistake, or ignorance of material facts alone, but the unconscientious advantage of the party by the concealment of them. Where the means of information are open to both parties, and where each is presumed to exercise his own skill, diligence and judgment in regard to all extrinsic circumstances, equity will not relieve against the mistake of fact. Story on Equity (14 Ed.), sections 219 and 221. To justify such relief in equity the proof of mistake must be clear, satisfactory and convincing, and sometimes even stronger phrases are used to describe the required quality of the evidence, as for instance, the "clearest proof," the "clearest and most satisfactory evidence," the "clearest and most positive proof," "clear, explicit and conclusive proof," and "evidence sufficiently cogent to satisfy the mind of the court." 21 C. J., page 90, and cases cited thereunder. We do not think that the evidence is sufficient to justify relief on the ground of mistake, but on the other hand, it appears that DeJarnatt was observing his custom of protecting the bank against any loss from its accommodations to him as collecting agent and by crediting him with the amounts of drafts when they were drawn. Certainly the bank is not guilty of any unconscionable conduct in retaining the advantage which it derived

when DeJarnatt repaid to it the amount which it had advanced for him. Bank v. Dibrell, 91 Tenn., 300; Swan v. Hodges, 3 Head, 255. It is especially provided in the negotiable instruments law, section 3516a117 of Shannon's Code, that notice of dishonor may be waived after the failure to give notice, and the waiver may be express or implied. Such we think was the intention of Mr. De-Jarnatt in his dealing with the Bank with reference to these drafts.

This conclusion is fully justified by the rule stated in Section 1152, Daniel on Negotiable Instruments (6 Ed.) as follows:

"When it is conceded or proved that there was laches in respect to the payment, protest or notice, the promise to pay after maturity should be regarded as prima facie evidence that the party making it knew of such laches whenever such knowledge is deemed necessary to constitute a waiver. It is a promise against interest. The drawer or endorser should know when the instrument to which he was a party fell due. His promise to pay presupposes it to be overdue and unpaid, and if he has not received notice he has every reason to suppose that it was not sent, and that the steps which should precede it were not taken." . . . Citing Chancellor Kent.

"The weight of authority is that this knowledge may be inferred as a fact from the terms under the attending circumstances, without requiring clear, affirmative proof of the knowledge."

The defendant complains of the admission by the chancellor of certain testimony over objections made by its counsel. The exceptions to questions 8 and 9, and answers thereto, in the deposition of J. W. Donnell are overruled. Certain questions propounded to J. W. Donnell and J. T. Donnell, witnesses for complainant. and the answers thereto, are excepted to because they relate to conversations or transactions had with the deceased, J. W. DeJarnatt. These witnesses are not parties to this cause and therefore, this testimony does not fall under the bank of Section 5598 of Shannon's Code.

The assignment of error to the admission of the testimony of J. W. Donnell as to a conversation between him and a lawyer in Granville, Illinois, is sustained.

The assignment of error to the admission of the testimony of J. W. Donnell, questions 44 and 45, and answers thereto, as to what he would have done had he known that the drafts were not paid promptly, is overruled. This testimony tends to show what a prudent, careful business man would have done to protect himself, and it is not mere speculation. In the view which we have taken of the case this testimony is not a factor in the determination of the issues involved.

We are therefore, of the opinion that the bill should have been dismissed by the chancellor.  His decree awarding any recovery is reversed and the bill is dismissed.  The costs of the cause, both in the court below and upon appeal, are adjudged against the complainant and the sureties on her cost bond and appeal bond.

Faw, P. J., and Crownover, J., concur.