FLAT CREEK SAVINGS BANK et al. v. FEDERAL RESERVE BANK OF ATLANTA, NASHVILLE BRANCH et al.

Middle Section. August 6, 1932.

Petition for Certiorari denied by Supreme Court, February 25, 1933.

528

■■■■■■■■

B. D. Kingree, of Shelbyville, and Norman Farrell, of Nashville, for appellants.

John A. Pitts, of Nashville, for Tennessee-Hermitage National Bank.

E. J. Smith and J. J. Vertrees, both of Nashville, for Federal Reserve Bank.

DeWITT, J.  This suit was brought by the Flat Creek Savings Bank, of Flat Creek, Tennessee, and D. A. Womack and E. W. Stone, of Bedford County, partners under the firm name of Womack and Stone, against the Federal Reserve Bank of Atlanta (Nashville Branch) and the Tennessee-Hermitage National Bank of Nashville, to recover the sum of $13,689.14, with protest fees and interest, for loss alleged to have been occasioned by the failure of defendants to comply with instructions accompanying four drafts aggregating said sum, drawn by Womack and Stone to the order of Flat Creek Savings Bank, on W. C. Halliburton of Roanoke, Virginia.

When each of these drafts was drawn, credit was given to Womack and Stone by the Flat Creek Savings Bank for the amount thereof, and they immediately checked against the same under a general agreement that if they were not paid by the drawee, they could be charged back against the drawers.  These drafts were for the proceeds of four carloads of hogs shipped by Womack and Stone to Halliburton between August 31st and September 11, 1928.  They were forwarded for collection by the Flat Creek Savings Bank to its correspondent bank, the Tennessee-Hermitage Bank, at Nashville, which credited the Flat Creek Savings Bank with the amounts there-

of. Thereupon the Tennessee-Hermitage National Bank transmitted the drafts to the Federal Reserve Bank at Nashville, to be forwarded to the Colonial National Bank of Roanoke for collection from Halliburton. The hogs were received by Halliburton, but, having become insolvent, he did not pay the drafts and they were protested for non-payment and ultimately returned to the Flat Creek Savings Bank.

After the bill was filed Womack and Stone made payments to the Flat Creek Savings Bank, which reduced their indebtedness to it on these drafts to $2068.33. Of the money so paid the sum of $4468.44 was derived by them through assignment by Halliburton of a claim which he held against the Norfolk and Western Railroad Company, and which was paid.

In the original bill it is alleged that Halliburton was enabled to get possession of the hogs as the direct result of a violation of instruction given to the Tennessee-Hermitage National Bank by the Flat Creek Savings Bank—"always send there drafts in such a way that Roanoke Bank will wire non-payment.". It is alleged that the Tennessee-Hermitage National Bank was directed so to instruct its correspondent banks through which the drafts were to be forwarded. In July, 1928, a draft for a shipment of hogs by Womack and Stone to Halliburton had been dishonored, but it was afterward paid.

In their bill the complainants allege that had the said instructions been complied with they would not have shipped hogs to Halliburton after the shipment for which the first draft was drawn; but that thinking that the instructions had been complied with, and that the draft had been paid promptly on presentation, and relying thereon, they subsequently made the three other shipments of hogs, and which they lost.

In the bill the Flat Creek Savings Bank prays in the alternative that its credit for the four drafts be restored in full or partially on the books of the Tennessee-Hermitage National Bank. It appears that on September 17, 1928, Womack and Stone had checked out the funds arising from the four drafts either before the drafts were issued or before they were dishonored.

At the hearing in the Chancery Court, the complainants, being thoroughly satisfied that the Tennessee-Hermitage National Bank had not transmitted the alleged instructions as to these drafts to the Federal Reserve Bank, dismissed their bill as to the latter. The only defendant now concerned is the Tennessee-Hermitage National Bank.

The complainants frankly concede that they cannot maintain this suit for losses on the first and second shipments since the proof shows that both of said shipments were delivered to Halliburton before the first draft reached the Bank at Roanoke on September 8, 1928; there-

fore the amount now involved is the aggregate of the third and fourth drafts, with protest fees and interest.

Upon the hearing upon a large record the Chancellor dismissed the bill upon two grounds: first, that the Flat Creek Savings Bank was the owner of the drafts in question and the only party complainant entitled to maintain this suit, and that Womack and Stone had no standing in the case; second, that the Flat Creek Savings Bank had suffered no damage by reason of the failure of the Tennessee-Hermitage National Bank to have the Roanoke Bank wire non-payment of the draft dated September 1, 1928, and therefore was not entitled to recover on any of the drafts involved. He accompanied his decree with an elaborate finding of fact and discussion of the questions of law, in writing. If the second reason given by the Chancellor is to be sustained, then of course the first would be immaterial, for if the failure of the Tennessee-Hermitage National Bank to have the Roanoke Bank to wire non-payment of the first draft was not the cause of the loss incurred, then neither complainant could recover.

The rule is that a bank, though negligent in the discharge of its duties as collecting agent, is not liable to its customer for a claim placed in its hands, unless it is shown that the claim was collectible by due diligence, and was lost in consequence of the bank's negligence; and that the burden is on the claimant to show these facts. Sahlien v. Bank, 90 Tenn., 220, 16 S. W., 373; L. & N. R. R. Co. v. Federal Reserve Bank, 157 Tenn., 503, 10 S. W. (2d), 683; De Jarnett v. Bank, 1 Tenn. App., 191. In order to maintain such an action both wrong and damage must concur.

The Chancellor found that the third draft, drawn on September 8, 1928, was for a shipment made on September 7th, and was received by the Tennessee-Hermitage National Bank on September 10th, one day after the shipment reached Halliburton on September 9th; and that the draft did not reach Roanoke until September 14th, five days after the shipment reached Halliburton. He found that the fourth draft, drawn on September 13th, was for a shipment made on September 11th; that this shipment reached Halliburton on September 13th, the very day on which the draft was drawn by Womack and Stone; that this draft was not received by the Tennessee-Hermitage National Bank until September 15th, two days after it was drawn, four days after the shipment was made and two days after it was delivered; and that this draft was not received by the Roanoke bank until September 18th, seven days after the shipment was made and five days after it was delivered.

The Chancellor also found that the first and second shipment reached Halliburton before the respective drafts therefor reached the Roanoke bank; that the first draft reached that bank on September

8th, and the second draft reached it on September 11th. These facts appear in a stipulation of counsel, in the record. The point made is that had the Roanoke bank wired to the Federal Reserve Bank at Nashville the facts as to the non-payment of these first two drafts, instead of reporting thereon through the mails, the third shipment would not have been made and the last shipment would have been stopped; and that the failure so to wire was due to the failure of the Tennessee-Hermitage National Bank, through the Federal Reserve Bank, to instruct the Roanoke Bank to inform it by telegraph of the fact of non-payment. This contention is met with the proposition that each shipment and draft must be treated as a separate and distinct transaction, therefore the wiring of non-payment by the Roanoke Bank could not have prevented the loss of the shipment covered by each draft and would have served no purpose whatever. This view appears to have been sustained by the Chancellor in connection with conclusions declared by him as follows:

"It is perfectly plain from the record that it could not have been in the mind of Bearden, Cashier of the Flat Creek Savings Bank, when the first shipment was made and draft drawn therefor, that if notice of non-payment of the draft was wired, the second shipment would not be made, and that it would be stopped in transit because the draft for the first shipment was not even forwarded for collection, or at least, received by the defendant bank, until September 4, four days after the shipment was made, and one day after it was delivered to Halliburton, and a day after the second shipment was made. If it was not in contemplation of the Cashier of the Flat Creek Savings Bank that the second shipment would not be made if the draft drawn for the first was not paid, how can it reasonably be insisted that he had in view at that time subsequent shipments and drafts.

"Neither of the complainants ever communicated to the defendant bank that subsequent shipments would not be made and drafts credited to Womack & Stone, if the Roanoke bank wired non-payment of the first draft. There is no proof in the record that the Tennessee-Hermitage National Bank had any notice of complainants' reasons for wanting notice wired of non-payment when it received the drafts for collection. There was nothing to suggest these reasons from the fact that Mr. Dozier, the Vice-President of the defendant bank, had been told that Womack & Stone were making shipments of hogs and drafts were being drawn to complainant bank as payee for such shipments. Such information would not of itself suggest to defendant bank that its failure to comply with the instructions to wire non-payment of drafts would probably result in more shipments and in not being able to stop those that were in transit. The Tennessee-

Hermitage National Bank knew that in July this identical thing had happened, namely, the draft of Womack & Stone to the Flat Creek Savings Bank as payee, drawn on Halliburton had been dishonored by Halliburton, and that subsequent shipments had been made to him.''

Womack and Stone were engaged extensively in dealing in livestock. They had arranged with the Flat Creek Savings Bank for it to honor their checks on it for the purchase of stock whether or not they had sufficient funds to their credit in that Bank to cover the checks. This course of dealing was carried on through the transactions which give rise to this controversy. In the spring of 1926 the Flat Creek Savings Bank through its cashier, Mr. Bearden, made the Tennessee-Hermitage National Bank its correspondent bank. The latter bank was represented by Mr. Dozier, its Vice-President. The agreement and course of dealing between the Flat Creek Savings Bank and Womack and Stone was that Womack and Stone would draw drafts on purchasers of stock in carload lots; that these drafts would be cashed by the Flat Creek Savings Bank and the checks theretofore given for purchase of the stock would be charged against the proceeds of the drafts, but with the right to charge the same back against Womack and Stone should any draft be dishonored. The agreement between the Flat Creek Savings Bank and the Tennessee-Hermitage National Bank was that such drafts would be forwarded by the Flat Creek Savings Bank to the Tennessee-Hermitage National Bank for collection, the Tennessee-Hermitage National Bank to credit the Flat Creek Savings Bank with the amount of each draft upon receipt thereof, with the right to charge back the same should it be dishonored, and the draft would be forwarded by the Tennessee-Hermitage National Bank for collection. The Tennessee-Hermitage National Bank, being a member of the Federal Reserve Bank, sent its drafts to that Bank to be forwarded for collection. Prior to July, 1928, a number of such drafts were drawn by Womack and Stone through the Flat Creek Savings Bank and these other Banks on W. C. Halliburton at Roanoke, Virginia, for shipment of hogs, without any instructions on the part of the Flat Creek Savings Bank to wire non-payment of any of those drafts. In July a draft drawn on Halliburton was not paid but was later paid. On August 18, 1928, a draft drawn by Womack and Stone on Halliburton in favor of the Flat Creek Savings Bank was sent by that Bank to the Tennessee-Hermitage National Bank with the instruction in writing, ''always send these drafts in such a way that Roanoke Bank will wire non-payment.'' The Tennessee-Hermitage National Bank sent this draft to the Federal Reserve Bank, Nashville Branch on a printed form, containing the words, ''wire non-payment on items of $500 and over,'' but also with the words in typewriting, ''please wire non-payment

87-6.'' These figures designated the Tennessee-Hermitage National Bank, it being the number of its membership in the American Bankers Association. It appears that this printed form was thereafter used by the Tennessee-Hermitage National Bank in sending the four drafts to the Federal Reserve Bank, Nashville Branch, but it was the form prescribed by the Federal Reserve Bank for forwarding cash items, that is checks or drafts drawn on banks, but that the Tennessee-Hermitage National Bank made no discrimination between cash items and non-cash items in the use of this form. These drafts were non-cash items because they were drawn by individuals on an individual; but according to its rules the Federal Reserve Bank did not request of its correspondents that non-payment be wired on non-cash items in this form of use.

The letter of August 18, 1928 from the Flat Creek Savings Bank to the Tennessee-Hermitage National Bank was filed away and the instruction to wire non-payment was not placed in typewriting or otherwise than in printing on the form letters accompanying the drafts here in controversy.

It appears that in June, 1926, when Mr. Dozier solicited of the Flat Creek Savings Bank the agreement thus to do business with the Tennessee-Hermitage National Bank, Mr. Bearden told him that Flat Creek Savings Bank had some customers named Womack and Stone who were livestock dealers, making shipments of livestock to various parties, and inquired if the Flat Creek Savings Bank could get a credit of drafts drawn therefor on the books of the Tennessee-Hermitage National Bank and this was agreed to; and that Mr. Bearden told Mr. Dozier that Womack and Stone were constantly making such shipments and the drafts would be forwarded to the Tennessee-Hermitage National Bank.

Recurring to the. proposition that each shipment and draft must be treated as a separate and distinct transaction, we are of the opinion that if the evidence showed that if a given draft were dishonored this fact came to the knowledge of Womack and Stone, they would not have made any subsequent shipment and this fact were known also to the Tennessee-Hermitage National Bank, there would be such a relation among these shipments that each could not be treated as wholly dissociated from any other. But, as the Chancellor found, there is really no substantial evidence that the Tennessee-Hermitage National Bank knew that the knowledge of dishonor of one draft would prevent further shipments to Halliburton, that is would cause Womack and Stone or the Flat Creek Savings Bank to avoid a loss. Mr. Womack testified that if at any time he had received such information he would not have made further shipment; but although the draft of August 18, 1928, was accompanied with a positive direc-

tion to wire non-payment Womack and Stone continued to make shipments in such a way that the hogs arrived and were delivered to Halliburton before the drafts respectively arrived at the Bank in Roanoke for collection. This showed clearly that Womack and Stone and the Flat Creek Savings Bank were not relying upon the precaution claimed as a protection against loss from further shipments.

The position of the Tennessee-Hermitage National Bank in this matter was that although it knew that these shipments were constantly being made and had received one request that these drafts always be sent with the aforesaid instructions, it did not know what would be done by Womack and Stone and the Flat Creek Savings Bank when notice would be received that a draft had not been paid. A shipment might be diverted to another point, or sold in the same market to another party, or the non-payment might be due to some other cause than inability to pay, such as dissatisfaction with the hogs. This appears to have been the cause of the non-payment of the draft drawn in July, 1928.

As to the third draft, it appears that the shipment for which it was drawn arrived in Roanoke Sunday, September 9, 1928, at 6 P. M.; that the draft for which the first of these four shipments was drawn reached the Colonial Bank at Roanoke and was protested by it on the previous day, Saturday, September 8th. That was a half holiday and the business of the bank ceased at noon on that day. It is claimed that if the Roanoke Bank had on that Saturday wired non-payment, the third shipment could have been prevented from being delivered to Halliburton when it arrived at 6 P. M. on Sunday, September 9th. But the evidence on this point is not sufficiently convincing to warrant such a conclusion. The cashier of the Roanoke bank said that had his bank been requested to wire non-payment of that first draft, the telegram would have gone out not later than two o'clock on Saturday, September 8th; but he qualified this by saying that it was impossible to say just the exact time the telegram would have been sent by his bank, although the general instructions for his collection department were to that effect. This telegram would have gone to the Federal Reserve Bank at Richmond, which forwarded the draft to the Roanoke Bank. The cashier of the Federal Reserve Bank at Richmond said that that Bank closed at noon on Saturday, in accordance with the regular hours prevailing with the clearing house banks in Richmond, and that while the manager of the collection department was in the department nearly two hours after the closing time for the day, he would not have been at his post to receive a message which might have been dispatched at the hour named by the Roanoke Bank as the probable hour for its dispatching. He said that there was only one very junior employee who remained in the collection department as late as 2:20 P. M. on that Saturday. The records of

the Federal Reserve Bank of Richmond showed that both the manager and the assistant manager of its non-cash collection department had left the office by 2 P. M., so that as the cashier said, the probabilities were that there were none in the non-cash collection department who could have given attention to the message, which would have been received more than two hours after the regular closing hour.

It appears from the testimony of the manager of the Federal Reserve Bank, Nashville Branch, that had such message reached his bank on that Saturday afternoon the matter would have been held over until the following Monday. In view of these facts we are unable to conclude that the loss of the third shipment would have been prevented by telegraphic advice that the first draft had been protested.

As to the fourth draft, it appears as aforesaid that the shipment was made on September 11, 1928, and was delivered to Halliburton on September 13th at 7:15 P. M.; that the draft for this shipment was not drawn by Womack and Stone at Flat Creek until September 13th. Of course it is borne in mind that up to that time the complainants had not received any notice of the dishonor of the preceding drafts. This last draft was protested at Roanoke on September 18th. On the preceding day the complainants learned that the first draft had been protested. However it appears that at 8 P. M. on September 11th Womack and Stone received from Halliburton a direction by telegram not to ship him any hogs. This last shipment had gone out on that day. They therefore, had ample time to stop the shipment by using the telegraph, but they did not do so. This telegram put them on notice that there was some reason why the shipment should not have been made; that Halliburton did not want the hogs and might not take them or pay for them. It appears therefore that had Womack and Stone taken care to protect themselves in view of the positive instruction from Halliburton, they would have avoided the loss of these hogs, and that their failure thus to take care was the producing cause. We concur with the Chancellor in his findings and conclusions above quoted; and for the reasons thus given we hold that even if the Tennessee-Hermitage National Bank was negligent in failing to observe the directions given by the Flat Creek Savings Bank, such negligence was not the cause of the losses sustained. This suit is not based on the general law but upon an alleged contract resulting in special damages to the complainant. These damages do not appear to have proximately resulted from the violation of such contract. The record shows that the Flat Creek Savings Bank held all of these four drafts and sued on them in this cause; that although after the bill was filed Womack and Stone paid back to that bank the debt represented thereby down to a balance of a little over $2000, nevertheless Womack and Stone owed to that Bank other sums. The drafts were exhibited by Mr. Bearden, the cashier and made a part

of the record by him. Therefore, under the rule in Tennessee, Womack and Stone have no right of action against the Tennessee-Hermitage National Bank upon these drafts.

Whatever may be the law in other jurisdictions, this question is ruled in Groveland Banking Co. v. City National Bank, 144 Tenn., 520, 234 S. W., 643, the fourth headnote of which is as follows:

"Where bank credits its customer's account with the amount of a draft secured by bill of lading, and the amount of such credit is drawn out by the customer, the bank's title to the draft is absolute, and is not rendered conditional by the fact that the customer agrees that the draft, on failure to collect, may be charged back against his account, for, by withdrawing the amount to his credit, any beneficial interest of the customer in the draft ceases."

In that case the determinative question was whether the Groveland Banking Company or its customers, Ewart and Lake, owned a draft with bill of lading attached, which had been drawn by Ewart and Lake, payable to the Groveland Banking Company indorsed and forwarded by it for collection—the understanding between the bank and Ewart and Lake being that, if the draft and bill of lading were returned to the customer, and thereby the customer recovered the control and right to disposition of the goods covered by the draft and bill of lading, the amount thereof would be charged back to the customer.

The case was distinguished from Implement Co. v. Bank, 128 Tenn., 320, 160 S. W., 848, upon the vital difference that in that case the drawers of the draft had made no checks upon the credit which they had received upon their account with the bank when the proceeding was begun; and it was held that the sale was only conditional. The bank had in its possession with which it could protect itself, the full amount of the draft which its customers had made in its favor. But in the Groveland Bank case Ewart and Lake, before the attachment proceeding was begun, had checked out their entire deposit with the bank. In so holding, the Court said:

"We are of the opinion that the decision in Implement Co. v. Bank, does not apply in the present case, and is not controlling for these reasons:

"The only possible qualification of the right and title of the bank to the draft and bill of lading was the right of the customer to call for a return of the draft and repay what he had received from the bank, and this right depended upon the customer never having received the proceeds; that is to say the customer had no right in the draft or in the bill of lading after he had appropriated the money which the bank had placed to his credit.

When he drew upon his credit, that was an acceptance of the money, and completed the transfer of the title and made the bank the absolute owner. The only condition to the unqualified ownership, being that created by the agreement made at the time, giving to the bank the right to return the draft and charge the customer therewith, ceased when the customer took from the bank the money placed to his credit, and the ownership of the bank became absolute.

"If the banking company had paid the money over to its customer, instead of depositing it to the customer's credit, the purchase and ownership of the bank would have been complete. The customer then would have had no interest whatever in the draft or bill of lading. The agreement upon the part of the bank to charge its customers with the amount of the draft on a certain contingency contemplated that the customer would have the funds in the bank against which the charge could be made. After the customer has drawn the money out which was placed to his credit, the same result follows as if the banking company had paid for the draft at the time of its delivery."

The governing principles were correctly applied by the Chancellor in the following excerpts from his opinion:

"The action of the complainant bank in retaining custody of these drafts, receiving payment from the drawers thereon, and crediting them on the drafts when the drawers were indebted to it for other sums that were not represented by the drafts involved, and by attempting to enforce collection of the balance due on the drafts by this suit, is consistent with ownership and inconsistent with the idea that the drafts belonged to Womack & Stone. So far as this record reveals, Womack & Stone are still depositors at this bank, and have been since the drafts came back dishonored.

"The question whether the Flat Creek Savings Bank is the owner of the drafts involved or whether the drafts were received by it under an agreement in advance to charge back on failure of collection, must be determined by the intention of Womack & Stone and the bank as evidenced by their acts. Implement Co. v. Bank, 128 Tenn., 323.

"The facts stated above, tested by this principle of law, shows that the Flat Creek Savings Bank, the payee of the drafts, was and is the absolute owner of them.

"The Tennessee Hermitage National Bank was the agent of the Flat Creek Savings Bank in the collection of the drafts involved. There is no privity of contract between the defendant bank and Womack & Stone, and the right to sue the Tennessee

Hermitage National Bank on the drafts accrues only to the holder and payee, the Flat Creek Savings Bank. Womack & Stone have no right of recovery against the defendant bank on the drafts involved. Bank v. Bank, 67 Tenn. (8 Baxter), 101; Bank v. Cummings, 89 Tenn., 618; L. & N. R. R. Co. v. Federal Reserve Bank, 157 Tenn., 507.''

All of the cases heretofore cited have been carefully analyzed, and the rule thus applied is the only rule that can properly be deduced therefrom. It should be added that it does not appear that Womack and Stone are insolvent. The Chancellor further said, correctly:

"The hogs for which these drafts were drawn were owned by Womack & Stone, the drawers of the drafts, and not by the payee, the Flat Creek Savings Bank. The latter bank had no title or claim to the hogs, nor did it have any power to stop the shipment in transit. No proof appears in the record that it would not have given Womack & Stone credit for each of the three drafts drawn after the first draft, if it had received notice of the dishonor of the first draft.''

It is further insisted that the Chancellor erred in not passing upon the issue whether or not the Tennessee-Hermitage National Bank had forwarded the instructions as to wiring non-payment to the Federal Reserve Bank, and in not holding that the Tennessee-Hermitage National Bank had not passed said instructions to the Federal Reserve Bank.

This assignment becomes immaterial in view of the conclusions heretofore declared. It is doubtless submitted for the purpose that if the conclusions were to the contrary, and if the assignment were sustainable, it would then only become material and effective. However, we find that when the four drafts were sent, respectively, to the Federal Reserve Bank, Nashville Branch, they were accompanied with the letters on printed forms, containing the instruction, ''Wire non-payment on items of $500 and over,'' but with no special instructions in writing. This form was used by the Tennessee-Hermitage National Bank for forwarding both cash and non-cash items; and was treated by the Federal Reserve Bank as applying only to cash items. In forwarding for collection drafts accompanied with this form, the Federal Reserve Bank, Nashville Branch, never requested the collecting bank to wire non-payment. On March 15, 1928, it had issued to the banks, including the Tennessee-Hermitage National Bank, two circulars, styled F-6 and F-6-A, as to these matters. In circular F-6 it set forth the terms and conditions under which it would receive collection, or non-cash, items. In circular F-6-A it directed where such items should be sent, charges for handling them, and then it set forth the following:

"When we are requested to do so by member banks, telegraphic advice of payment or non-payment of non-cash collection items will be obtained by us and telegraphic advice will be given."

In neither of these circulars was it pointed out that the form letter which was used by the Tennessee-Hermitage National Bank would be treated as only accompanying or referring to cash items. The evidence preponderates against the contention that any of the officers or employees of the Tennessee-Hermitage National Bank knew that the Federal Reserve Bank so treated this form letter. Therefore, it must be concluded that they had a right to believe that when they used this form letter as accompanying these drafts they were requesting that the fact of non-payment of any of these drafts would be made known by telegram.

Of course, this conclusion in itself would be determinative as to any liability on the part of the Tennessee-Hermitage National Bank.

It results that there is no error in the decree dismissing the bill, and it is affirmed. The costs of the appeal will be adjudged against the appellants and the sureties on their appeal bond.

Faw, P. J., and Crownover, J., concur.